Filed 11/17/23  P. v. Guzman CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JESUS GUZMAN,<br><br>    Defendant and Appellant. | H047877<br>(Santa Clara County<br> Super. Ct. No. C1365678) |

A jury found defendant Jesus Guzman guilty on 14 counts of sexually assaulting two child victims.  The jury further found Guzman committed 11 of the offenses against more than one victim, and that he had previously been convicted on two counts of lewd and lascivious acts against a child under 14 years of age.  The trial court imposed an aggregate sentence of 1,005 years to life in prison.

Guzman raises numerous claims on appeal.  First, he contends the trial court erred by admitting testimony by the prosecution's expert on Child Sexual Abuse Accommodation Syndrome (CSAAS).  Second, he contends the trial court erred by instructing the jury with CALCRIM No. 1191B that it could infer, based on proof from some of the offenses, that he was disposed to commit and did commit other charged crimes.  Third, he contends the prosecutor committed misconduct during closing argument by repeatedly referring to him as a "sexual predator" and describing him as unreformed and unrehabilitated.  Because defense counsel did not object, Guzman contends counsel rendered ineffective assistance in violation of the Sixth Amendment.

Fourth, he contends his conviction must be reversed based on cumulative prejudice from the multiple errors set forth above.

Fifth, Guzman contends his sentence was unauthorized because the trial court imposed five-year terms for a prior serious felony conviction under Penal Code section 667, subdivision (a) on eight counts in which the charging document did not plead the enhancements. Sixth, he argues his sentence violates the Eighth Amendment's prohibition on cruel and unusual punishment. Finally, he argues the trial court erred by imposing a $10,000 restitution fine without determining whether the had the ability to pay under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

For the reasons below, we conclude these claims are without merit, and we affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural Background

The prosecution charged Guzman with 14 counts: counts 1, 2, 4, and 6 through 13—lewd or lascivious act on a child under 14 years of age (Pen. Code, § 288, subd. (a))[1]; counts 3 and 5—aggravated sexual assault on a child under 14 years of age and 10 or more years younger than Guzman (former § 269); and count 14—lewd or lascivious act on a child 14 or 15 years of age when Guzman was at least 10 years older than the child (§ 288, subd. (c)(1)). As to all counts except counts 3, 5, and 14, the prosecution further alleged Guzman committed the offenses against more than one victim (§ 667.61, subd. (b)), and that Guzman had been previously convicted of an offense specified in section 667.61, subdivisions (a), (c), and (d) ("One Strike Law"). As to counts 1, 2, 4, 6 and 8, the prosecution alleged Guzman had suffered a prior serious felony conviction. (§ 667, subd. (a).) Finally, the prosecution alleged Guzman had suffered two prior strike convictions. (§§ 667, subds. (b)-(i), 1170.12.)

---

[1] Subsequent undesignated statutory references are to the Penal Code.

The case proceeded to trial in January 2019. The jury found Guzman guilty on all counts as charged and found all allegations true.

The trial court imposed an aggregate sentence of 1,005 years to life in prison. The sentence consisted of 11 consecutive terms of 75 years to life for each of counts 1, 2, 4, and 6 through 13 (25 years to life for each count based on the multiple victims enhancement, tripled for the strike priors); a consecutive five-year term for each of the 11 prior serious felony enhancements on counts 1, 2, 4, and 6 through 13; 45 years to life for each of counts 3 and 5 (15 years for each count, tripled for the strike priors); two consecutive five-year terms for the prior serious felony enhancements on counts 3 and 5; and 25 years to life on count 14 based on the strike priors.

## B. Facts of the Offenses

The prosecution alleged Guzman sexually molested his nephew, T.D., and T.D.'s female cousin A.D., on multiple occasions in 2006 and 2007. T.D. was four to five years old at the time, and A.D. was 12 to 13 years old. Guzman was 25 years old in 2006.

Guzman had previously been convicted on two counts of lewd and lascivious acts on a child under 14 for molesting T.D.'s older sister, N.D., committed in 2003. He was released from prison in May 2006.

### 1. Counts 1 through 7 (Molestation of T.D.)

T.D. was born in 2001, and he was 17 years old when he testified at trial. His biological parents struggled with drug abuse and T.D. was separated from them at an early age. The first home he could remember was that of his Aunt M. T.D. recalled seeing Guzman there for the first time, and sometimes Guzman would take T.D. and his brothers to Guzman's apartment. Guzman was nice to T.D., letting him watch television there and giving him food. Sometimes Guzman would take T.D. and his brother to the pool. T.D. sometimes spent the night at Guzman's apartment.

T.D. testified about three incidents at Guzman's apartment. The first time, Guzman called T.D. into the bathroom, took off T.D.'s clothing, and put him on the floor.

3

Guzman then put his penis on T.D.'s buttocks, and T.D. started yelling. Guzman told him to stop, and Guzman put his hands over T.D.'s mouth. On the second occasion, T.D. was sitting on the toilet in the bathroom, whereupon Guzman entered and put his penis into T.D.'s mouth. T.D. did not want to open his mouth, but Guzman grabbed T.D.'s head and "just started doing it." On the third occasion, Guzman started touching T.D.'s penis and buttocks, and Guzman made T.D. kiss him on the mouth. T.D. testified that over the course of these three occasions, Guzman put his penis in T.D.'s buttocks once; put his penis in T.D.'s mouth once; touched T.D.'s penis about three times; touched T.D.'s buttocks about two times; and made T.D. kiss him once. These incidents all occurred in the bathroom at Guzman's apartment.

T.D. never told anyone at Aunt M.'s house about these incidents because he never talked to anyone there. In October 2007, Aunt M. gave up her rights as a legal guardian of T.D. and he was placed into emergency custody. In June 2012, T.D. disclosed to his adoptive mother that Guzman had sexually molested him.

### 2. Molestation of A.D. (Counts 8 through 14)

A.D. was born in 1993. She was 25 years old when she testified at trial. She had known Guzman since before the sixth grade, when he was hanging around her mother. Around the time A.D. entered the sixth grade, she and Guzman struck up a friendship. They talked a lot, and A.D. considered Guzman to be "like my best friend." He showed her a lot of attention, and she liked it, so she always wanted to be around him. Around the time she entered the seventh grade, the relationship started to change. She started wearing tighter, closer-fitting clothing around the house because he told her he liked it. They started texting and talking on the phone.

One day Guzman kissed A.D. She cared about him, and he liked her, so it did not bother her. He started doing other things to her. He would take off her shirt and play with her breasts, or she would take off her pants. He would tell her to "hump him" while

4

they were sitting on the stairs. When her pants were off, sometimes he used his mouth on her, and sometimes he would use his fingers and play with her.

A.D. estimated that between the sixth grade and the eighth grade, Guzman used his mouth on her "maybe more than ten" times and used his hands on her more than ten times. He played with her breasts "many times." A.D. also testified that she gave Guzman oral sex "a handful" of times. She had testified at the preliminary hearing that he put his penis in her mouth 20 to 30 times. He tried to have intercourse with her twice by putting his penis inside her, but "he didn't want to pop it," so "he didn't go all the way."

All these encounters occurred in A.D.'s apartment. She and Guzman discussed whether she was okay with them having this relationship, because he was worried about getting in trouble. She was okay with it because she did not mind the attention, but she never told anyone else about it because she knew it was wrong. One day she was sitting on his lap in her bedroom, and her mother's boyfriend saw them kissing. The boyfriend told Guzman to leave, and A.D. was upset because she did not want Guzman to get in trouble. The boyfriend told A.D.'s mother about it, but A.D. refused to talk to her about it. Guzman never came back to the house again, but he and A.D. communicated online, and they met twice at a McDonald's. A.D. was sad about the relationship ending because she felt she was losing her best friend.

Later, around the time A.D. was a freshman in high school, she told her aunt that she and Guzman had "messed around and stuff" at A.D.'s house. That was the first time A.D. told someone else about it. When A.D. was about 20 years old, her cousin (T.D.'s father) showed up at her house and started asking questions. As a result of the conversation, A.D. went to the district attorney's office to tell them her story.

On cross-examination, A.D. agreed that she had testified at the preliminary hearing that "it all started" when her sister was about one year old. A.D. was 14 years

5

old at that time, and she was in the eighth grade.  On redirect examination, she testified that the sexual encounters began in the seventh grade, when she was 13 years old.

### 3.  *Defense Evidence*

Guzman testified in his defense.  He denied that he had ever molested T.D. or had any kind of sexual relations with A.D.  He conceded he had been convicted of molesting N.D., but he denied that he had actually molested her.

The defense presented several witnesses who testified variously that Guzman was a good father; that they trusted him around their children; that he was not the type of person who would molest children; or that he had never acted inappropriately around their children.  The defense also presented two expert witnesses—one who testified to the susceptibility of memories to suggestibility, and a second who testified to the unscientific nature of CSAAS evidence.

## II. DISCUSSION

### A.  *Admission of Expert Testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS)*

Guzman contends the trial court erred by admitting testimony by the prosecution's expert on CSAAS.  He argues the jurors did not hold any misconceptions about how child abuse victims react, such that the testimony was irrelevant and inadmissible.  The Attorney General contends the trial court properly admitted the testimony under existing California Supreme Court precedents.

### 1.  *Legal Principles*

To be admissible, expert testimony must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact," among other criteria.  (Evid. Code, § 801, subd. (a).)  CSAAS evidence is admissible for limited purposes.  It may not be used to prove the alleged sexual abuse actually occurred, but CSAAS is admissible "for the limited purpose of disabusing the fact finder of common misconceptions it might have about how child victims react to

6

sexual abuse. [Citations.]" (*In re S.C.* (2006) 138 Cal.App.4th 396, 418.) The prosecution may explicitly identify misconceptions about victims' behavior that CSAAS testimony is intended to rebut. (*People v. Harlan* (1990) 222 Cal.App.3d 439, 449-450.) Such evidence may be relevant and admissible where a victim's conduct relates directly to those misconceptions. (*Id.* at p. 450.) "For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394 (*Bowker*).)

"The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 426.) Evidence Code section 352 gives trial courts discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "Rulings under Evidence Code section 352 come within the trial court's broad discretion and will not be overturned on appeal absent a showing of an abuse of that discretion." (*People v. Brooks* (2017) 3 Cal.5th 1, 43.)

### 2. *Factual and Procedural Background*

Guzman moved in limine to exclude CSAAS expert testimony on multiple grounds including, as relevant here, that the evidence would not be "sufficiently beyond common experience" such that it would not assist the trier of fact under Evidence Code section 801, subdivision (a). The trial court denied the motion.

7

Guzman renewed his motion after the jury voir dire, which included the use of juror questionnaires.[2] Guzman argued that the jurors selected for trial had stated they had no preconceived notions of how an abuse victim acts following a molestation. According to defense counsel's motion, "None of the selected jurors stated that they *do not believe* that when a child delays reporting or repeatedly alters their descriptions of alleged abuse that this necessarily means that no sexual abuse happened to that child." Counsel's motion further asserted, "Moreover, the jurors confirmed they give no credence to . . . commonly held misconceptions." The motion argued that there was therefore no need for expert testimony on CSAAS to disabuse jurors of misconceptions because they did not hold any such misconceptions.

The trial court denied the renewed motion. The court quoted the questionnaire as asking jurors, "Do you have any preconceived notions about how alleged victims of sexual assault should act[?]" The court noted that jurors may not realize they have such preconceived notions, and that jurors may not be able to accurately state whether or not they have biases, which may be unconscious or subconscious. The court also found that jurors did not state whether they would be able to overlook unexpected behavior by victims or that such behavior would not impact jurors' ability to assess the victims' credibility, particularly since the jurors had not yet heard evidence regarding the specific facts concerning the alleged victims in this case. The court found there was no change in circumstances that would warrant any change in its initial ruling denying the motion to exclude.

At trial, Dr. Blake Carmichael, a clinical psychologist at the U.C. Davis Children's Hospital, testified for the prosecution as an expert in CSAAS. Dr. Carmichael testified that he did not know any of the facts of this case, and he had not read or been given any information about the case.

---

[2] The questionnaires are not in the record, but the trial court quoted one of the questions at a hearing on the motions in limine.

8

Dr. Carmichael testified that there are five components to CSAAS: secrecy; helplessness; entrapment and accommodation; delayed, unconvincing, or inconsistent disclosures; and retraction or recanting. He described each of these components in detail and testified about common behaviors associated with them. He testified that CSAAS is not itself a treatment or a diagnosis. CSAAS is an educational tool to give people information about how sexually abused children behave, and to dispel misconceptions about how such children tend to behave.

The trial court instructed the jury twice—first at the start of Dr. Carmichael's testimony, and again after the close of evidence—that CSAAS testimony "must not be considered by you as proof that the alleged victims' molestation claim is true. [. . .] You should consider the evidence concerning the syndrome and its effect only for the limited purpose of showing if it does that the alleged victim's reactions as demonstrated by the evidence are not inconsistent with him or her having been molested."

### 3. Admission of Expert Testimony Was Not an Abuse of Discretion

As he argued below, Guzman contends the trial court erred by admitting Dr. Carmichael's testimony on CSAAS because the prosecutor failed to establish that jurors had any misconceptions about how sexually abused children behave in response to abuse. He argues that CSAAS evidence is no longer relevant because in recent years, "a tidal wave of child sexual abuse allegations and revelations has drowned out the misconceptions CSAAS was devised to refute." He cites to news articles concerning allegations of child sexual abuse by members of the Catholic priesthood, celebrities, and athletic coaches to young athletes including gymnasts and college football players. Guzman contends that as a result of increased publicity concerning such incidents, "the general public is now well aware that children who suffer sexual abuse may not report that abuse for years, and may not do so consistently." Guzman acknowledges that existing California case law has historically allowed for the admission of CSAAS evidence for limited purposes, but he contends it should now be held inadmissible. He

9

relies on case law from other jurisdictions for this proposition. (See *Commonwealth v. Dunkle* (1992) 529 Pa. 168, 181-182.)

However the jurors' responses to the questionnaire on which Guzman relies are not in the record, and the unsworn statements of counsel are not evidence. (*In re Zeth S.* (2003) 31 Cal.4th 396, 414, fn. 11.) And as the trial court aptly noted, a question asking jurors whether they "have any preconceived notions" seem unlikely to elicit accurate responses, as it assumes jurors will know their own notions are "preconceived" and would acknowledge having them.

The California Supreme Court has recognized that most jurors may lack a common understanding of how child sexual abuse victims react. In the context of behavior exhibited by the parents of child victims, where "the rules appear equally applicable," the Court has held, "Most jurors, fortunately, have been spared the experience of being the parent of a sexually molested child. Lacking that experience, jurors can rely only on their intuition or on relevant evidence introduced at trial." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1302.) " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. [¶] The great majority of courts approve such expert rebuttal testimony.' " (*Id.* at p. 1301, quoting Myers et al., *Expert Testimony in Child Sexual Abuse Litigation* (1989) 68 Neb. L. Rev. 1, 89.) Absent evidence in the record showing jurors did not hold any such misconceptions, we cannot conclude the trial court abused its discretion by adhering to the rationale of the California Supreme Court.

Guzman further contends the trial court violated his federal due process rights by admitting irrelevant and prejudicial evidence under Evidence Code sections 801 and 352. We conclude above that admission of CSAAS expert testimony did not violate California rules of evidence, but even assuming it did, the admission of such evidence did not render Guzman's trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 439 [the

admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial fundamentally unfair].) None of the authorities cited by Guzman would support a contrary conclusion.

For the reasons above, we conclude these claims are without merit.

### B. *Jury Instruction With CALCRIM No. 1191B*

Guzman contends the trial erred by instructing the jury with CALCRIM No. 1191B that it could infer, based on proof from certain of the charged offenses, that he was disposed to commit and did commit the other charged crimes.

Consistent with CALCRIM No. 1191B and Evidence Code section 1108, subdivision (a), the court instructed the jury, "The People presented evidence that the defendant committed the crimes of lewd and lascivious acts on a child under 14, charged in counts 2, 4, 6, 7, 8, 9, 10, 11, 12, and 13, and aggravated sexual assault on a child under 14 in counts 3 and 5, and lewd and lascivious acts on a child 14 to 15, as charged in count 14 of the Information. [¶] If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but are not required to conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses. And that based on that decision also conclude that the defendant was likely to commit and did commit the other sex offenses charged in this case. [¶] If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of another crime. The People must still prove each charge beyond a reasonable doubt."

Guzman acknowledges that the California Supreme Court upheld this instruction in *People v. Villatoro* (2012) 54 Cal.4th 1152. He argues that case was wrongly decided, and he brings the claim in this court to preserve his right to seek review by a higher court. Because we are bound by California Supreme Court precedent, we find this claim without merit. (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d

11

450, 455 [under the doctrine of *stare decisis*, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction].)

### C. Ineffective Assistance of Counsel Based on Failures to Object to Prosecutorial Misconduct During Closing Argument

Guzman contends the prosecutor committed misconduct during closing argument by repeatedly referring to him as a "sexual predator" and describing him as unreformed and unrehabilitated. Because defense counsel did not object, Guzman contends counsel rendered ineffective assistance in violation of the Sixth Amendment. The Attorney General contends Guzman has not shown any misconduct or error by either the prosecutor or defense counsel, and that Guzman has failed to show any prejudice.

#### 1. Legal Principles

"Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial." (*People v. Lucas* (1995) 12 Cal.4th 415, 473.) " 'A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury.' [Citation.]" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1179 [holding that prosecutor's fleeting suggestion that defendant was evil, followed by a call to eradicate such evil, was not grounds for reversal].) "A prosecutor may 'vigorously argue his [or her] case and is not limited to "Chesterfieldian politeness" ' [citation], and he [or she] may 'use appropriate epithets warranted by the evidence.' [Citations.]" (*People v. Fosselman* (1983) 33 Cal.3d 572, 580.)

" ' "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible

12

methods to attempt to persuade either the court or the jury.' " ' [Citation.] ' "It is, of course, improper [for the prosecutor] to make arguments to the jury that give it the impression that 'emotion may reign over reason,' and to present 'irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response.' " ' [Citation.] We consider the assertedly improper remarks in the context of the argument as a whole. [Citation.] 'In conducting [our] inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' [Citation.]" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 894.)

"However, 'To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely objection, make known the basis of his objection, and ask the trial court to admonish the jury.' [Citation.] There are two exceptions to forfeiture: (1) the objection or the request for an admonition would have been futile; or (2) the admonition would have been insufficient to cure the harm occasioned by the misconduct. [Citation.] A defendant claiming one of these exceptions must find support for it in the record. [Citation.]" (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1406 (*Dowdell*).)

" 'To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. [Citations.] Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.' [Citations.] ' "Finally, prejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' [Citation.] 'It is the defendant's burden on appeal [. . .] to show that he or she was denied effective assistance

13

of counsel and is entitled to relief. [Citations.] "[T]he burden of proof that the defendant must meet in order to establish his [or her] entitlement to relief on an ineffective-assistance claim is preponderance of the evidence." [Citation.]' " (*Dowdell*, *supra*, 227 Cal.App.4th at pp. 1406-1407.)

### 2. *Procedural Background*

At the start of her closing argument, the prosecutor stated, "I told you at the beginning of this trial that this case was about a sexual predator who had previously been convicted by a jury beyond a reasonable doubt of child molest. When he got out of prison, he continued to prey on members of his own family. That's what I told you the case was about, and that's exactly what the evidence has shown."

Later in her closing argument, the prosecutor stated, "We know that [A.D.] didn't disclose. She knew it was wrong. She liked the attention. The defendant told her 'do not tell or I will get in trouble.' [¶] [T.D.] was fearful and very ashamed about what happened to him. The defendant became empowered because they kept it a secret to do it again and again. [¶] And remember, he only stopped molesting them because he no longer had the opportunity, not because he chose to stop. He no longer had access to [T.D.], because [Aunt M.] gave him back to the foster care system. He no longer had access to [A.D.], because he got caught and was no longer allowed back at their home. He had a natural inclination to molest children, and that's why he stopped."

At the end of her closing argument, the prosecutor stated, "This is all of the evidence that you have heard in this case. [T.D.] is credible beyond a reasonable doubt. [A.D.] is credible beyond a reasonable doubt. You have so much corroborating evidence. [N.D.], and the fact that she—a jury found him guilty beyond a reasonable doubt, he has a tendency, a predisposition to molest. He is a sexual predator that could not help himself and stopped only because he got caught. Make him responsible for his actions, and find him guilty beyond a reasonable doubt of all crimes charged."

Defense counsel did not object to any of these statements.

14

### 3. *Defense Counsel Did Not Render Ineffective Assistance*

Guzman contends the prosecutor's statements constituted inflammatory characterizations of him that appealed to the passions or prejudices of the jurors. He argues that the prosecutor's description of him as "a sexual predator that could not help himself and stopped only because he got caught" constituted an appeal to jurors' prejudices to keep a dangerous sexual predator off the street. Guzman argues that multiple witnesses testified they were comfortable having their children around him and did not believe he had the characteristics of a child molester. He further contends the claim that he "stopped only because he got caught" misstated the evidence because the crimes were alleged to have occurred between 2006 and 2008, while he was not arrested until 2013.

Guzman does not dispute that he forfeited any claims of prosecutorial misconduct by failing to object at trial. Rather, he contends his trial counsel's failure to object to these statements fell below the standards required of reasonably competent counsel, and counsel could not have had any tactical reason for declining to object.

The Attorney General contends the prosecutor's characterization of Guzman as a sexual predator was amply supported by the record, which included a prior conviction for sexually molesting his niece, N.D. Guzman was not adjudicated to be a sexually violent predator in that case, but the evidence supported an inference that he started molesting A.D. within months of his release from prison. The Attorney General argues the jury reasonably could have inferred that he was a sexual predator based on the prior conviction as well as the evidence supporting the crimes charged in this case. As to the prosecutor's statement that Guzman "stopped only because he got caught," the Attorney General argues that, viewing the argument as a whole, the prosecutor meant that Guzman only stopped molesting the victims because he lost access to them, not because he was caught by law enforcement. For example, the prosecutor argued Guzman no longer had access to T.D. because Aunt M. gave him back to the foster care system, and Guzman no

15

longer had access to A.D., because he got caught by the mother's boyfriend and was no longer allowed back at their home. The Attorney General argues all these statements were permissible inferences based on the evidence presented at trial.

While some of the prosecutor's statements bordered on inflammatory, we do not conclude they were so prejudicial or lacking any basis in the evidence that they require reversal. The evidence in the record supports a reasonable inference that Guzman stopped molesting T.D. and A.D. after losing access to them, and that he had a tendency to act as a sexual predator of children. But even assuming the prosecutor's characterization of Guzman as a sexual predator constituted prosecutorial misconduct, defense counsel may have made a tactical decision not to object. The record shows defense counsel chose to address the prosecutor's statements in his own closing argument, which he began by stating, "The hardest part of a trial for me is to sit there in that chair and listen to closing argument of the district attorney. I can't even imagine what it's like to be sitting in that chair, over there as Mr. Guzman, and sit down and listen to the things she's saying. [¶] *Sexual predator?* Okay. Propensity? A natural tendency to do something? He can't help himself? He can't stop what he's doing? Ok. Let's take that for a second. [¶] We know that nothing could possibly have happened to [T.D.] after October of 2007 that had anything to do with Mr. Guzman We know that it couldn't possibly have—had anything that happened with [A.D.] after November of 2007. [¶] What did he do in 2008? Where were all the problems that he was having with little children in 2008? What about 2009? What about 2010? What about 2011? What about 2012? What about 2013, right up to the time where he got arrested? Never a single problem." (Italics added.) Defense counsel then argued, "To a T, every single person that has come in here and said this is not a guy who would do these kinds of things. [¶] I don't know what happened to [T.D.]. I'm not here to tell you what happened to [T.D.]. What I'm here to tell you is that Mr. Guzman did not do anything to [T.D.]."

16

The record shows defense counsel was cognizant of the potentially prejudicial nature of the prosecutor's statements, but counsel consciously chose to remain silent during the prosecutor's closing, addressing the remarks in his own closing instead. Counsel may have believed that an objection might not result in a favorable ruling by the trial court, and that he could more effectively persuade the jury that the prosecutor's statements constituted overreaching or a mischaracterization of the evidence if he addressed them himself without objecting. He may have reasonably determined that even if the trial court had sustained an objection, the objection itself would have highlighted his client's prior convictions for lewd and lascivious acts on a child. He may also have concluded that no matter what the trial court's ruling on his objection, at least some jurors were likely considering the significance of his client's past conduct as they determined whether he had committed sex offenses here. It was reasonable under these circumstances for counsel to use his closing argument to directly counter the prosecutor's characterization of Guzman as a predator rather than objecting during the prosecutor's closing argument. In short, even if the prosecutor's comments constituted prosecutorial misconduct, defense counsel's tactical election to forego objecting to them did not constitute ineffective assistance of counsel.

For the reasons above, we conclude this claim is without merit. Guzman further contends reversal is required by the cumulative effect of prejudice from the alleged errors discussed above in sections II.A, II.B, and in this section (section II.C). Because we conclude that none of these claims constituted error, there is no prejudice to cumulate.

### D. *Imposition of Five-Year Terms Under Penal Code Section 667, Subdivision (a)*

The trial court imposed five-year terms under section 667, subdivision (a) (section 667(a)) on each of counts 1 through 13 based on the jury's findings that Guzman had previously been convicted of committing lewd and lascivious acts on a child under 14. Guzman contends we must strike the five-year terms imposed on counts 3, 5, 7, and 9 through 13 because the information only charged the prior conviction under section

17

667(a) as to counts 1, 2, 4, 6, and 8. The Attorney General acknowledges the prior conviction under section 667(a) was only charged on counts 1, 2, 4, 6, and 8, but he argues the trial court was authorized to impose them notwithstanding any deficits in the pleading.

### 1. *Procedural Background*

The prosecution alleged Guzman had previously been convicted on two counts of a lewd and lascivious act on a child under 14. The information alleged these prior convictions in three ways: as a serious felony prior attached to each of counts 1, 2, 4, 6, and 8 under section 667(a); as a one-strike allegation attached to each of counts 1, 2, 4, 6, 7, 8, 9, 10, 11, 12, and 13 under section 667.61, subdivisions (a) and (d); and as two violent or serious felonies ("strike priors") as to all counts under section 667, subdivisions (b) through (i), and section 1170.12. As to the application of the five-year enhancement for the serious felony prior under section 667(a), the probation report recommended consecutive five-year terms on all 14 counts, but the trial court ruled the enhancement did not apply to count 14.

At the sentencing hearing, the trial court stated, "I want to make a record of the way we looked at and considered the prior convictions in this case. I'll give you a chance to comment." The court described the three ways in which the convictions had been alleged in the information, as set forth in the paragraph above. The court then memorialized discussions the court and the parties engaged in before charging the jury. The court noted first that the parties agreed that rather than providing the jury with verdict forms that would require findings on the convictions as charged under each of the three statutory provisions on each pertinent count, the jury would instead be given a verdict form that would simply require a single finding as to whether Guzman had been convicted on each of the two counts of lewd and lascivious acts. The court added, "Further, we talked about the prior convictions, *and while conviction on the same two priors may have different sentencing ramifications, the parties agree they don't need to*

18

*be proved to the jury in more than one way.* The court thereafter asked both parties if they wished to make any further record on that matter and both counsel declined. The court views this agreement as a stipulation between the parties." (Italics added.)

Accordingly, the trial court noted, it provided the jury with two verdict forms—one for each of the two convictions—that the jury used to find Guzman had previously been convicted on each of the two counts of lewd and lascivious acts on a child under 14.

The trial court then stated that it revisited the matter after the probation officer asked how the prior convictions should be used in the sentencing recommendation. The court stated that it emailed the probation officer's request to the parties together with a restatement of the parties' stipulation—that by finding the prior convictions true, "the jury necessarily found the same elements of the allegation at issue." The court's e-mail proposed to issue an order to probation that these allegations were proved as a matter of law and by stipulation between the parties. The court added, "This was discussed in some detail in chambers and then put on the record. Neither party commented on the court's intended action via e-mail." The court then solicited comments from both parties on the matter, and both declined.

Accordingly, the court then ruled, "Based on the foregoing, the court finds that the penal code section 667.61(d) allegations attached to counts 1, 2, 4, 6, 7, 8, 9, 10, 11, 12, and 13, as well as the allegation as to all counts with the priors constituted a serious felony prior, pursuant to penal code section 667(a); that with the exception for count 14 that I just mentioned, are true, and have been found true by the jury as a matter of law." Defense counsel did not object to this application of section 667(a). The court then sentenced Guzman as described above, including the imposition of consecutive five-year terms on each of counts 1 through 13 under section 667(a).

### 2. *Legal Principles*

"All enhancements shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact." (§ 1170.1,

19

subd. (e).) "A defendant has a due process right to fair notice of the allegations that will be invoked to increase the punishment for his or her crimes." (*People v. Houston* (2012) 54 Cal.4th 1186, 1227 (*Houston*).) "Due process of law requires that an accused be advised of the charges against him so that he has a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial. [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 317.) This principle applies to sentence enhancements as well. "[E]nhanced penalties [are] available only if the existence of any of those qualifying circumstances 'is alleged in the accusatory pleading pursuant to this section, and is either admitted by the defendant in open court or found to be true by the trier of fact.' [Citations.]" (*People v. Arias* (2010) 182 Cal.App.4th 1009, 1017-1018 (*Arias*).)

### 3. *Guzman Stipulated to the Sentencing Enhancements on Counts 1 to 13*

Guzman relies on *People v. Mancebo* (2002) 27 Cal.4th 735 (*Mancebo*). In *Mancebo*, the jury found the defendant personally used a firearm in the commission of the offense, but the prosecution had to choose between using that fact to impose a determinate-term enhancement under section 12022.5, subdivision (a), or a life term under the One Strike Law (§ 667.61, former subd. (e)(4)). (*Id.* at pp. 742-743.) The prosecution had initially intended to use the gun use as an enhancement under the One Strike Law. But at sentencing, the prosecutor sought to dismiss the gun-use allegation under the One Strike Law and substitute a multiple-victim circumstance (§ 667.61, former subd. (e)(5)) so that both the determinate-term enhancement and the life term could be imposed. The California Supreme Court held that section 667.61, subdivision (f) precluded the trial court from striking the gun-use allegation to free up gun use as a basis for imposing lesser enhancement terms under section 12022.5, subdivision (a), and that the defendant did not forfeit the claim by failing to object at the sentencing hearing. (*Id.* at pp. 749-750, fn. 7.)

Guzman also relies on *Arias*, *supra*, 182 Cal.App.4th 1009. Arias was convicted on two counts of attempted murder but the charging document failed to allege the attempted murders were willful, deliberate, and premeditated. (*Id.* at p. 1017.) After neither party objected to the trial court's proposed jury instructions and verdict forms, the court instructed the jury that if it found Arias guilty of attempted murder, then it must make a separate finding whether it was done willfully and with premeditation and deliberation. (*Ibid.*) After the jury found Arias guilty of "first degree attempted murder" as to both victims, the trial court imposed life terms for the convictions. (*Ibid.*) On appeal, Arias argued the prosecution's failure to plead that the attempted murders were willful, deliberate, and premeditated required the life sentences to be set aside. Relying on *Mancebo*, *supra*, the Court of Appeal agreed and struck the sentences. The Court rejected the Attorney General's argument that Arias had forfeited his claim that the indictment was inadequate. (*Arias*, at p. 1017.)

The Court of Appeal's decision in *People v. Nguyen* (2017) 18 Cal.App.5th 260 (*Nguyen*) is closer on point. A jury convicted Nguyen on various charges arising from his contracting without a license. He also had a prior first degree burglary conviction that qualified as an enhancement under three statutory provisions: as a strike prior under section 667, subdivisions (b) through (i); as a one-year prior prison term enhancement under former section 667.5, subdivision (b); and as a five-year prior serious felony under section 667(a). (*Id.* at p. 262.) The information alleged the fact of the prior conviction together with the statutory provisions defining a strike prior (§ 667, subds. (b)-(i)) and a prior prison term enhancement (former section 667.5, subd. (b)). But the information "never specifically alleged—either in so many words or by citing the relevant statute—a prior serious felony conviction enhancement." (*Ibid.*) After the jury convicted Nguyen on the charged counts, he admitted the fact of the prior conviction but he did not expressly admit its legal effect. At sentencing, the trial court used the prior conviction as

21

both a strike prior and a prior serious felony, imposing an additional five-year term for the latter. Nguyen did not object. (*Id.* at pp. 264-265.)

Relying on *Mancebo*, *supra*, the Court of Appeal in *Nguyen* held the trial court erred by imposing a five-year term for the prior serious felony conviction. (*Nguyen*, *supra*, 18 Cal.App.5th at pp. 265-270.) The Court reasoned, "The information affirmatively indicated that the prior conviction was being pleaded *solely* for purposes of the three strikes law. Significantly, every prior serious felony conviction is *necessarily* also a strike prior. [Citations.] Charging language which expressly states that a fact is alleged to invoke one particular statute does not adequately inform the accused that the People will use it to invoke a different statute. [Citations.] Accordingly, when, as here, the People allege a prior serious felony conviction, and when they cite the three strikes law but do not cite the prior serious felony conviction statute, we can only conclude that they have made 'a discretionary charging decision.' " (*Id.* at pp. 266-267.) The Court of Appeal also held defense counsel did not forfeit the claim on appeal, insofar as the claim was based on section 1170.1, subdivision (e), because the violation resulted in an unauthorized sentence. (*Id.* at p. 272.)

The Attorney General acknowledges that under *Nguyen* the prosecution would have been required to specifically plead the same statutory provision at issue here— section 667(a)—to support imposition of an enhancement on counts 3, 5, 7, and 9 through 13. Nonetheless, based on the trial court's memorialization of the parties' discussions as set forth above in section II.D.1, the Attorney General contends the sentence was properly imposed because defense counsel stipulated to the application of section 667(a) on each of counts 1 through 13. Guzman disagrees. He characterizes the memorialized discussions as pertaining solely to the verdict forms and what needed to be proved to the jury. He points out that the parties did not specifically discuss the omission of the prior serious felony enhancements on counts 3, 5, 7, 9, 10, 11, 12, and 13.

22

We are persuaded by the Attorney General's position. While the court did not expressly mention the applicability of the prior serious felony enhancements on the challenged counts, the court specifically noted that "while conviction on the same two priors may have different sentencing ramifications, the parties agree they don't need to be proved to the jury in more than one way." Defense counsel did not respond to this characterization of the memorialized discussion. Similarly, when the trial court asked counsel for responses to the probation officer's request about how to use the priors for sentencing, defense counsel offered no response. Counsel also did not object to the probation report's use of the priors to recommend additional five-year terms in the manner now challenged.

Ordinarily, a defense attorney's failure to object at sentencing does not forfeit a challenge to an unauthorized sentence on appeal. (*Mancebo*, *supra*, 27 Cal.4th at p. 749, fn. 7.) But in this case, the effect of trial counsel's acquiescence with respect to the claim on appeal is more akin to equitable estoppel or invited error. (See *People v. Ford* (2015) 61 Cal.4th 282, 284-285 [a party seeking or consenting to action beyond the court's power may be estopped from complaining that the resulting action exceeds a court's jurisdiction].) " ' " 'Judicial estoppel precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position.' " ' " (*People v. Castillo* (2010) 49 Cal.4th 145, 155.) Estoppel "generally requires a showing that a party's words or acts have induced detrimental reliance by the opposing party." (*Lynch v. California Coastal Com.* (2017) 3 Cal.5th 470, 475-476.) If, prior to the jury being instructed, trial counsel had objected to the proposed general verdict form and the stipulation that the priors had been proved as to each count, the prosecution could have requested an amendment to the information alleging the five-year priors on the challenged counts, and the jury could have been provided count-specific jury forms for the priors. By instead stipulating to the priors being proved with respect to the relevant counts and agreeing to the general verdict form, counsel was estopped from

23

lodging a later objection at sentencing to the use of the prior as the basis for five-year terms on counts 1 through 13. Estoppel applies in this circumstance because an objection lodged for the first time at sentencing, after having entered into the earlier stipulation, would have come too late to allow for an amended information and count-specific verdict forms. In other words, counsel's acquiescence induced the prosecution to forgo any amendment and rely on a general verdict form—a form of reliance that would have been detrimental to the prosecution had the trial court upheld an objection to use of the priors at the time of sentencing. (See also *Houston*, *supra*, 54 Cal.4th at p. 1229 [distinguishing *Arias, supra,* and holding defendant's claim of sentencing error was forfeited where the trial court notified defendant of the possible sentence he faced before his case was submitted to the jury, and defendant had sufficient opportunity to object to the indictment].)

Furthermore, this is not a situation where Guzman could have been prejudiced by a lack of notice because the information indisputably put him on notice with respect to each of counts 1 through 13 that he would be required to challenge the fact of the prior convictions to avoid an enhanced penalty. We have found a lack of notice dispositive in striking penalty enhancements based on pleading defects where the possibility of enhanced penalties could have affected plea negotiations. (*People v. Jimenez* (2019) 35 Cal.App.5th 373, 397 (*Jimenez*), citing *Mancebo*, *supra*, 27 Cal.4th at p. 752.) In *Jimenez*, during pretrial discussions on a disposition, the trial court explicitly misinformed the defendant of his possible exposure by calculating the possible sentence *based solely on the enhancements as pleaded*. But Guzman cites to no such misstatements by the trial court in this case. Regardless, the additional exposure based on the enhancements at issue here—five-year terms for each of eight counts, for an additional 40 years in prison—was insignificant compared with the 965 years of exposure based on the charges and enhancements as pleaded in the information. It is unlikely this difference would have affected Guzman's decisions in any negotiations for a disposition.

24

Guzman argues that if defense counsel forfeited his claim by failing to challenge this application of the sentencing enhancements, then counsel provided constitutionally ineffective assistance of counsel. But as explained above, if defense counsel had lodged a timely objection instead of stipulating to the proposed procedures, the prosecution could have moved to amend the information, and nothing in the record suggests an amendment would have been improper. The trial court likely would have granted such an amendment, and there is no reasonable probability the jury's findings on the prior would have been any different if it had been required to make findings on each specific count. Accordingly, Guzman has not shown that any asserted deficiency in defense counsel's performance would have prejudiced him in any fashion. Alternatively, if trial counsel had instead waited until sentencing to object for the first time, the trial court would have overruled the objection properly for the reasons explained above. Declining to lodge a meritless objection does not constitute deficient performance. (*People v. Anderson* (2001) 25 Cal.4th 543, 587.)

For the reasons above, we conclude this claim is without merit.

### E. Cruel and Unusual Punishment Under the Eighth Amendment

Guzman contends his sentence of 1,005 years to life in prison violates the Eighth Amendment's prohibition on cruel and unusual punishment. The Attorney General contends settled law establishes this claim is without merit.

"A punishment violates the Eighth Amendment if it involves the 'unnecessary and wanton infliction of pain' or if it is 'grossly out of proportion to the severity of the crime.' " (*People v. Retanan* (2007) 154 Cal.App.4th 1219, 1230.) When the length of a particular sentence is challenged, "the Court considers all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive." (*Graham v. Florida* (2010) 560 U.S. 48, 59 (*Graham*).)

The calculus of whether a sentence is "grossly disproportionate" "must begin by comparing the gravity of the offense and the severity of the sentence." (*Graham*, *supra*,

560 U.S. at p. 60.)  "Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." (*Rummel v. Estelle* (1980) 445 U.S. 263, 272 (*Rummel*).)  If " '[i]n the rare case' " an " 'inference of gross disproportionality' " can be drawn, "the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions." (*Graham*, at p. 60.)  It is only where "this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' " that the sentence will be found unconstitutional under the Eighth Amendment.  (*Ibid.*)

Guzman argues his sentence amounts to imprisonment for life without the possibility of parole.  The Attorney General does not dispute this.  Guzman was 39 years old at the time of sentencing, and there is no reasonable possibility he would survive long enough to become eligible for parole.  The Attorney General argues that the sentence is not grossly disproportionate because it serves valid penal purposes:  It reflects society's strong condemnation of the type of crimes Guzman committed, it serves to deter others from the committing the same crimes, and it serves a retributive purpose congruent with the nature of the offenses and the harm inflicted on the victims.

We do not agree with all the Attorney General's justifications, but we are bound by settled law.  Guzman cites no case comparable to his wherein a California court has struck down an effective life sentence as a violation of the Eighth Amendment.  "[I]mposition of a sentence of life without possibility of parole in an appropriate case does not constitute cruel or unusual punishment under either our state Constitution [citation] or the federal Constitution.  [Citation.]" (*People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383.)  The United States Supreme Court has upheld life sentences imposed under state law for such offenses as possession of a large quantity of cocaine (*Harmelin v. Michigan* (1991) 501 U.S. 957), theft of golf clubs (*Ewing v. California* (2003) 538 U.S. 11), and obtaining money by false pretenses (*Rummel*, *supra*, 445 U.S. 263).  Guzman

26

relies on Justice Mosk's concurring opinion in *People v. Deloza* (1998) 18 Cal.4th 585. But a concurring opinion is not binding precedent. " '[N]o opinion has value as a precedent on points as to which there is no agreement of a majority of the court.' " (*Byrd*, at p. 1383.)

For the reasons above, we conclude this claim is without merit.

### F. *Imposition of a $10,000 Restitution Fine*

The trial court imposed a $10,000 restitution fine under section 1202.4, subdivision (b). Guzman objected based on his inability to pay, but the court did not rule on the objection. He now contends the trial court violated his due process rights by imposing the fine without determining his ability to pay under *Dueñas, supra*, 30 Cal.App.5th 1157.[3] The Attorney General argues the fine was properly imposed.

Because Guzman was 39 years old at sentencing, and his sentence effectively constitutes a life sentence, any wages he earns in prison may be used to pay the fine for an indeterminate number of years, which forecloses any meritorious inability to pay argument. (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1035, citing *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 [court may consider ability to earn prison wages in determining ability to pay].) "While it may take defendant some time to pay the amounts imposed in this case, that circumstance does not support his inability to make payments." (*People v. Aviles* (2019) 39 Cal.App.5th 1055, 1077.)

Accordingly, we conclude any error under *Dueñas* was harmless. (*People v. Johnson* (2019) 35 Cal.App.5th 134, 139-140 [error harmless beyond a reasonable doubt when defendant was sentenced to eight years in prison].)

### III.  DISPOSITION

The judgment is affirmed.

---

[3] This issue is currently under review in the California Supreme Court in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.

_____
Greenwood, P. J.

WE CONCUR:


_____
Grover, J.


_____
Bromberg, J.


H047877
People v. Guzman